Opinion Issued May 25, 2006



     










In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00096-CV




HERITAGE HOUSING DEVELOPMENT, INC. F/K/A HERITAGE
GERIATRIC HOUSING DEVELOPMENT, INC. AND HERITAGE
GERIATRIC HOUSING DEVELOPMENT VIII, INC. D/B/A HERITAGE
SAM HOUSTON GARDENS, Appellants

V.

VELMA CARR, AS AN HEIR AT LAW AND THE REPRESENTATIVE OF
THE ESTATE OF RAYMOND CARR, DECEASED, Appellee




On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Cause No. 2001-54025




O P I N I O N

          Velma Carr brought this survival action for the negligent nursing home care
and treatment of her husband, seeking damages against the nursing home, Heritage
Geriatric Housing Development VIII, Inc. d/b/a Heritage Sam Houston Gardens
(“Houston Gardens”), the nursing home’s parent corporation, Heritage Housing
Development, Inc. f/k/a Heritage Geriatric Housing Development, Inc. (“HHD”), and
several doctors and nursing home administrators. A jury found the nursing home, the
nursing home’s parent corporation, and three of the nursing home’s employees
negligent in the care of Mr. Carr. The nursing home and its parent corporation appeal
the judgment, claiming—among other things—that the evidence is legally insufficient
to support a verdict based on vicarious liability against both corporate entities. We
hold that the evidence is legally insufficient to support a verdict against the parent
corporation and reverse the judgment against it. We further hold that the evidence
is legally sufficient to support the claim for negligence against the nursing home. 
Because it is probable that including the parent corporation in the negligence charge
affected the jury’s apportionment of liability and damages as to the nursing home and
the remaining defendants, we remand the case for a new trial on the negligence claim
against the nursing home.
I. BACKGROUND
          A. Mr. Carr’s Condition
          In February 1999, Raymond Carr was admitted to Houston Gardens, a nursing
home representing that it specialized in caring for residents with Alzheimer’s disease. 
Mr. Carr’s medical records indicate that at the time of his admission he had been
suffering from Alzheimer’s disease for about ten years, and that his cognitive skills
had deteriorated in ways are typical of an Alzheimer’s patient. He was unable to
provide for his own personal hygiene and was unsteady in walking. Records also
indicate he was well groomed, exhibited good hygiene, weighed 190 pounds, and had
no signs of pressure sores or contractures. Subsequent to Mr. Carr’s admission to
Houston Gardens, his health seriously deteriorated. Mrs. Carr introduced evidence
at trial—including medical records and testimony from the nursing home staff—that
her husband endured substandard care from understaffed and undertrained employees
at Houston Gardens. Among other evidence, Carr proffered exhibits and testimony
that the Houston Gardens staff failed to re-position her husband, provide adequate
incontinent care, administer range of motion exercises, maintain adequate nutrition,
and provide adequate pain medication for a dislocated shoulder and pressure sores
that he sustained while a resident of the nursing home. After residing at Houston
Gardens for just over fifteen months, Mr. Carr was admitted to Golden Age nursing
home, where he resided until his death two years later.
          B. The Entities Involved
          Houston Gardens is a nursing home certified by the Texas Department of
Human Services as an Alzheimer’s facility, and is operated by Heritage Geriatric
Housing Development VIII, Inc., a corporate entity that held the state license for the
operation of the nursing home. HHD is the parent company of Houston Gardens. A
third entity, Health Care Holdings, LLC, managed the facility, pursuant to a
management contract with Houston Gardens, for most of the time Houston Gardens
cared for Mr. Carr. Carr nonsuited Health Care Holdings at the close of her case-in-chief.
          Houston Gardens thus is the state licensed health care provider and is the entity
that entered into a management agreement for Health Care Holdings to manage the
personnel and make hiring decisions at the nursing home. Though Houston Gardens
did not produce the majority of payroll checks or time cards for the period Mr. Carr
was a resident, one employee’s file contains a manual payroll check listing Houston
Gardens as the employer. During trial, the witnesses represented they were employed
at Houston Gardens.


 Certain employment applications, however, include HHD’s
name on them and include the hourly pay rate, the employee’s position, and the shift
the employee was to work. Houston Gardens used HHD’s manuals on nursing home
policies and procedures, and required employees to sign various acknowledgment
forms that contained HHD’s name at the top.
          C. The Jury’s Findings
          The jury found for Carr, awarding a total of $2,204,000 in actual damages. 
Counsel for HHD moved for an instructed verdict, objecting to HHD’s submission
to the jury on the basis that no evidence existed to support recovery against it on a
theory of vicarious liability. In particular, HHD argued that employment applications
listing HHD’s name constituted legally insufficient evidence that it controlled the
details of patient care at Houston Gardens. The jury found HHD liable for 45% of the
damages, and Houston Gardens liable for 40%. The jury apportioned the remaining
liability among the individual defendants, each of whom settled with Carr during the
pendency of this appeal. The jury also awarded exemplary damages, having made
affirmative findings of malice on the part of the defendants based upon clear and
convincing evidence. The defendants moved for a judgment notwithstanding the
verdict and a new trial. The trial court denied the motions and rendered a judgment
based on the jury’s verdict.
II. HHD’S APPEAL
          On appeal, HHD presents six arguments, including that the trial court erred in
entering judgment against it because the evidence is legally and factually insufficient
to prove that it is vicariously liable for the conduct of the nursing home employees. 
Carr responds that HHD is vicariously liable for the negligent treatment provided by
the nursing home because it was the employer of the nursing home staff and
possessed the right to control the staff. On appeal, Carr denies any claims against
HHD based on piercing the corporate veil or on any theory of direct negligence (for
example, insufficient budgeting). Thus, the limited issue before this court is whether
the evidence is legally and factually sufficient to support the judgment of vicarious
liability against HHD on the basis that it employed the nursing home staff who
provided negligent health care. 
          A. Legal Sufficiency—Standard of Review



          To demonstrate legal insufficiency on appeal, a litigant that did not bear the
burden of proof at trial must show that there is no evidence to support the contested
finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983); Beard v. Beard, 49
S.W.3d 40, 55 (Tex. App.—Waco 2001, pet. denied). A no-evidence point will be
sustained when (a) there is a complete absence of evidence of a vital fact, (b) the
court is barred by rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more
than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the
vital fact. King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003). A
reviewing court must view the evidence in a light most favorable to the verdict,
indulging every reasonable inference that supports it, but the court may not disregard
evidence that allows only one inference. City of Keller v. Wilson, 168 S.W.3d 802,
822 (Tex. 2005). “The final test for legal sufficiency must always be whether the
evidence at trial would enable reasonable and fair-minded people to reach the verdict
under review.” Id. at 827.
          B. Vicarious Liability of Employers

          Under the doctrine of respondeat superior, an employer is vicariously liable for
the tortious acts of its employees when they act within their scope of employment. 
Baptist Mem’l Hosp. Sys. v. Sampson, 969 S.W.2d 945, 947 (Tex. 1998). Employers
are held liable for the conduct of their employees because employers have the right
to control the means and methods of the employee’s work. Id.; Restatement
(Second) of Agency § 220 cmt. d (1958). In cases in which it is unclear who should
be considered an “employer” for the purposes of vicarious liability, the controlling
factor is the right to direct and control the details of the employee’s work. See St.
Joseph Hosp. v. Wolff, 94 S.W.3d 513, 537–38 (Tex. 2002) (plurality opinion).
          For example, under the borrowed employee doctrine, whether a general
employee of one employer has become the borrowed employee of another employer
hinges on whether the other special employer has the right to direct and control the
employee with respect to the details of the particular work at issue. Id. The test is
whether the borrowing employer has the right to control the progress, details, and
methods of operation of the work. Limestone Prods. Distrib., Inc. v. McNamara, 71
S.W.3d 308, 312 (Tex. 2002); Farrell v. Greater Houston Transp. Co., 908 S.W.2d
1, 3 (Tex. App.—Houston [1st Dist.] 1995, writ denied). The borrowing employer
must control not merely the end sought to be accomplished, but also the means and
details of its accomplishment. Thompson v. Travelers Indem. Co., 789 S.W.2d 277,
278 (Tex. 1990). Similarly, a party is not ordinarily vicariously liable for the actions
of an independent contractor, because an independent contractor has sole control over
the means and methods of the work he will accomplish. See Enserch Corp. v. Parker,
794 S.W.2d 2, 6 (Tex. 1990). An agent is considered an employee only if the
principal has both the right to assign the agent’s tasks and the right to control the
means and details by which the agent will accomplish those tasks. Hannah v. Vastar
Res., 84 S.W.3d 372, 376 (Tex. App.—Beaumont 2002, no pet.). Thus, the right to
control is the “supreme test” for determining who is the employer for the purposes of
vicarious liability. St. Joseph, 94 S.W.3d at 542.
          We recognize that there is a joint-venture exception to this rule. See
Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176 (Tex. 1997). A joint
venture exists if there is community of interest in the venture, an agreement to share
profits, an agreement to share losses, and a mutual right of control. Id. In a joint
venture, all the entities engaged in the venture may be jointly and severally liable for
the conduct of their employees because they share control over the details of the
employees’ work. See Battaglia v. Alexander, 177 S.W.3d 893, 904 (Tex. 2005)
(finding two professional associations providing anesthesia services to hospital 
jointly and severally liable because they were engaged in joint venture). Here, none
of the parties contended that a joint venture existed between HHD and Houston
Gardens. Thus, to determine whether HHD is vicariously liable for the conduct of the
nursing home staff in this case, we review the evidence to determine whether it
supports a determination that HHD controlled the details of the nursing home staff’s
work.
          C. Legal Sufficiency of Evidence of HHD as Employer

          Carr contends the employment paperwork the nursing home staff completed
that has HHD’s name on it, or refers to HHD as the employer, demonstrates HHD’s
employment of the nursing home staff and establishes HHD’s vicarious liability. Carr
points to employment-at-will statements, job description acceptance forms, substance
abuse policy notices, Equal Opportunity Employment statements, acknowledgment
of time clock procedures, no solicitation policy notices, ethics and conduct policies,
disciplinary and termination forms, and receipt of employee handbook
acknowledgments as evidence supporting a finding that HHD employed the nursing
home staff. Carr also observes that the nursing home used administrative manuals
containing HHD’s policies and procedures, thus further indicating that HHD
controlled the details of the work performed. 
          HHD responds that Houston Gardens, not HHD, held the state license to
operate the nursing home, and Houston Gardens is the entity that, together with
Health Care Holdings, managed the facility. Houston Gardens stipulated at trial that
it employed the nursing home staff. In addition, the testimony at trial about the chain
of authority at the nursing home reflects that Houston Gardens controlled patient care,
not HHD. Houston Gardens contracted with Health Care Holdings to employ the
nursing home administrator, who managed the nursing home and exercised the most
control over operating the facility. The director of nursing, the unit manager, the
charge nurse, and the nurses’ aides reported to the administrator. The nurses’ aides,
who provided eighty to ninety percent of the hands-on care to the patients, were
supervised up the chain-of-command, and ultimately answered to the administrator. 
Chandra Wiltz-White, administrator of Houston Gardens from October 1999 to April
2000, testified that she was ultimately responsible for ensuring that the nurses’ aides
were properly trained and competent to provide care to the patients, and that this was
critical to ensuring that patients received proper care because the nurses’ aides were
the ones providing most of the hands-on care to patients. HHD did not employ
White. Carr did not controvert this evidence with testimony or exhibits establishing
that HHD controlled the details of patient care.



          The facts here parallel those in St. Joseph Hospital v. Wolff—although some
evidence suggests one entity was involved in hiring employees and establishing
general employment policies, none of the evidence is legally sufficient to establish
vicarious liability, given the uncontroverted evidence that another entity controlled
the provision of care to patients. In St. Joseph, St. Joseph Hospital was the
sponsoring institution of a medical residency program with “final responsibility” for
the residents and the quality of the education they received. 94 S.W.3d at 543. St.
Joseph controlled the academic training and rotation schedule, and could limit the
type of patient care a resident provided. Id. The Central Texas Medical Foundation
(the “Foundation”) was a participating institution that placed residents at one of its
facilities where its teaching staff would oversee the residents. Id. The Foundation’s
Director of Surgical Education was responsible for the residents’ training, and the
Foundation reserved the right to suspend residents if they did not meet the
Foundation’s standards of performance. Id. At the time the resident in that case acted
negligently, he was under the supervision of one of the Foundation’s directors. Id. 
The Texas Supreme Court reversed a finding of negligence against St. Joseph based
on vicarious liability for the resident’s tortious acts, holding that the Foundation had
the right to direct and control the details of the resident’s work. Id. Thus, the
evidence was legally insufficient to support a theory of vicarious liability against St.
Joseph. Id.
          As in St. Joseph, here the evidence is legally insufficient to support a finding
that HHD—in contrast to Houston Gardens, the nursing home entity—controlled the
details of the medical care provided to Mr. Carr. Although HHD was involved in
hiring the nursing home employees and establishing policies—as evidenced by its
corporate name on employment applications and manuals—the other evidence offered
at trial establishes that Houston Gardens and Health Care Holdings, not HHD,
controlled the details of employees’ actions relating to the care Mr. Carr received.
Absent statutory duty, joint venture, or other contractual agreement, only one entity
is vicariously responsible under the common law and it is the entity that controls the
details of the work the employees perform. See id. at 537–38; Limestone, 71 S.W.3d
at 312; Baptist Mem’l, 969 S.W.2d at 947; Thompson, 789 S.W.2d at 278. Although
Carr offered evidence that HHD was involved in establishing the general conditions
of employment, Houston Gardens—not HHD—controlled the details of the care
patients received at the nursing home. See City of Keller, 168 S.W.3d at 821 (stating
that in St. Joseph, “evidence that a hospital controlled a doctor’s rotation and patient
assignments raises no material conflict with evidence that a different entity controlled
the details of medical treatment, as only the latter is material in a malpractice case”).
          Our review of the evidence supports this conclusion. First, the documents that
list HHD as the employer relate to general employment policies and procedures, but
they do not indicate that HHD controlled the details of the staff’s daily assignments;
rather, both parties offered evidence that the staff of Houston Gardens did so. 
Although the fact that the nurses signed forms at the start of their employment
promising to follow ethics or drug-free workplace policies, and that the employee
manual came from HHD would ordinarily indicate that HHD was the entity enforcing
the standards set forth in the manual, it does not do so here, where the witnesses
testified that they worked for Houston Gardens, another entity that controlled the
details of the work. See St. Joseph, 94 S.W.3d at 537–38; Standard Oil Co. v.
Anderson, 212 U.S. 215, 222, 29 S. Ct. 252, 254 (1909) (“[W]e must carefully
distinguish between authoritative direction and control, and mere suggestion as to
details or the necessary cooperation[.]”). In St. Joseph, a number of documents
demonstrated that residents were bound by the policies and procedures of St. Joseph
Hospital, but establishing policies and procedures is not tantamount to controlling the
actual work that is performed, if the evidence is that another entity did so. 94 S.W.3d
at 543; see also Watson v. Nortex Wholesale Nursery, Inc., 830 S.W.2d 747, 749–51
(Tex. App.—Tyler 1992, writ denied) (holding entity that controlled details of work
was employer, despite fact that another entity was listed as employer on various
workers’ compensation documents).
          Thus, even if Carr is correct that documents reflect the employees applied for
employment with HHD, and that HHD could decide who would be fired, these facts
are insufficient to impose vicarious liability if the evidence is uncontroverted that
another entity—here, Houston Gardens—supervised the details of the work and
stipulated that it was the employer. In St. Joseph, the hospital “agreed to pay [the
resident] a stipend, to give him three weeks’ vacation, and to provide him uniforms,
a laundry service, a parking space, life and health insurance, a room when assigned
to night duty, and professional liability insurance.” 94 S.W.3d at 524. Those factors
were not legally sufficient evidence to establish vicarious liability, however, because
the amount of control an entity exercises over the terms and conditions of a worker’s
employment is different from the amount of control the entity exercises over the
details of the actual work that person performs. See, e.g., Cherqui v. Westheimer St.
Festival Corp., 116 S.W.3d 337, 345 (Tex. App.—Houston [14th Dist.] 2003, no pet.)
(holding that imposing liability on employer requires more than paying wages). To
determine which entity has vicarious liability, we look to which entity controlled the
details of the work performed, not which entity controlled the general conditions of
the worker’s employment. Here, all of the employees who supervised the care to Mr.
Carr testified that they worked for Houston Gardens, the entity that held the state
license to provide the health care.
          Moreover, the testimony of Sydney Gerber does not provide legally sufficient
evidence that HHD—in contrast to Houston Gardens—controlled the details of the
health care provided at the nursing home. Gerber is a licensed nursing home
administrator who testified as an expert to nursing home standards of care, state
licensing requirements, and the relationship of the entities involved. Gerber
acknowledged that Houston Gardens held the license to operate the nursing home. 
He also testified that Health Care Holdings, the management company, was very
much involved in operating the nursing home. Finally, Gerber testified that the
management contract with Health Care Holdings expired in August 1999, and that
“Sam Houston Geriatric Housing, Inc.” subsequently operated the facility. It is this
latter testimony that Carr relies upon to support vicarious liability against HHD.
          There are three problems with such reliance. First, “Sam Houston Geriatric
Housing, Inc.” is not the name of any defendant that could have controlled the
nursing home staff. It is impossible to tell to which entity Gerber was referring, as
both Heritage Sam Houston Gardens and Heritage Geriatric Housing Development,
Inc. are named defendants. Second, the management contract Gerber refers to as
“terminated” is Exhibit 509, a contract between Health Care Holdings and Heritage
Danforth Gardens, a different nursing home from the one implicated in Mr. Carr’s
care. Finally, Chandra Wiltz-White, hired in October 1999 as the nursing home
administrator, testified that she was fired from Houston Gardens by Health Care
Holdings in April 2000, after Gerber claims the contract between Health Care
Holdings and Houston Gardens terminated. This testimony thus does not provide any
evidence that HHD—in contrast to Houston Gardens—controlled the employees
providing health care to Mr. Carr while he resided at the nursing home.
          In addition, Houston Gardens, not HHD, contracted with Health Care Holdings
to assist in the management of the nursing home. The parties did not offer this
agreement into evidence, but White’s testimony indicated that Health Care Holdings
oversaw employees through the nursing home administrator, and possessed the
authority to stop admissions to the facility and set the budget for operations. All the
nursing staff at Houston Gardens reported to the Houston Gardens administrator, who
in turn testified that she reported to Health Care Holdings. When Houston Gardens
obtained its Texas license, it disclosed that another entity, Health Care Holdings,
would manage the nursing home. Any authority Health Care Holdings had with
respect to the daily activities of the nursing home and the ultimate care Mr. Carr
received derived from a contract with Houston Gardens, not with HHD. Thus, this
evidence allows no inference that HHD controlled the details of the care Mr. Carr
received.
          D. The 4590i Report
          Although Carr filed a report under former article 4590i for Houston Gardens,
she did not do so for HHD.


 HHD moved to dismiss the claims against it on the basis
that Carr never filed a report with regard to it, and raises Carr’s failure to do so on
appeal. In the trial court, Carr maintained that HHD was not a health care provider,
and therefore no 4590i report was necessary. Carr’s failure to file a 4590i for HHD
based on her contention that HHD is not a health care provider undercuts her
contention that HHD should be held vicariously liable for the negligent provision of
health care. Carr correctly argues that she would not be required to file an expert
report for HHD if HHD was not a health care provider. Carr cannot, however, both
recover from HHD for provision of negligent health care, and simultaneously escape
the requirement of filing a 4590i report against HHD as a health care provider. If we
accept Carr’s contention that HHD controlled the details of the provision of health
care, a contention that must be true for Carr to recover under a vicarious liability
theory in this case, then HHD would be considered a health care provider under cases
interpreting 4590i, and Carr would have been required to file an expert report. See
Campbell v. MacGregor Med. Ass’n, 966 S.W.2d 538, 542 (Tex. App.—Houston [1st
Dist.] 1997), aff’d in relevant part, rev’d in part, 985 S.W.2d 38, 39 (Tex. 1998)
(holding professional associations providing health care as physicians were included
under definition of health care provider, despite not being specifically included in
plain language of statute, because legislature intended broad reading). At the time of
this suit, the statute defined health care provider as any institution “duly licensed or
chartered by the State of Texas to provide health care.” See Act of May 30, 1977,
65th Leg., R.S., ch 817, 1977 Tex. Gen. Laws 2039, 2041, 2064, repealed by Act of
June 30, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 864
(current version at Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(12) (Vernon
2005)). Carr argues that because HHD was never licensed by the State, it cannot be
considered a health care provider for the purposes of former article 4590i. 
          Carr cannot square HHD’s exemption from the statutory definition of health
care provider with her contention that legally sufficient evidence supports the jury’s
implied finding that HHD controlled the details of the health care services provided
at Houston Gardens. We are not suggesting that an entity outside the definition of
health care provider under 4590i could never be liable for the conduct of health care
staff. See St. Joseph, 94 S.W.3d at 539–40 (holding fact that corporations are legally
prohibited from practicing medicine does not preclude them from being liable for
practicing medicine negligently where evidence indicates they controlled details of
provision of health care). Rather, here, HHD falls outside the definition of health
care provider because it was not the state-licensed entity providing the health care to
Mr. Carr—Houston Gardens was—and therefore it cannot be liable for providing
negligent health care. Conversely, if HHD provided the health care to Mr. Carr, then
under MacGregor, it is an entity controlling licensed health care professionals for
which article 4590i requires a report. 966 S.W.2d at 541.
          We hold, applying St. Joseph Hospital, that legally insufficient evidence exists
that HHD exercised any right to control the details of the nursing home’s care to Mr.
Carr, given the uncontroverted evidence that another entity did so. Because common
law vicarious liability is the sole basis for Carr’s claim against HHD, we reverse the
judgment against HHD. We thus do not address HHD’s remaining issues on appeal. 
          E. Effect of Reversal
          If the jury’s apportionment of liability could have been affected by an issue on
which the trial court charged the jury but on which there was legally insufficient
evidence, a new trial on the entire negligence claim is required. Romero v. KPH
Consol., Inc., 166 S.W.3d 212, 230–31 (Tex. 2005). In Romero, the trial court
instructed the jury that if it found the codefendants liable under either of two theories
of liability, then it should apportion liability for the injury. Id. at 219. The court of
appeals held the evidence legally insufficient to support one of the theories of
liability, and remanded for a new trial on the entire negligence claim “[b]ecause the
jury would probably have apportioned liability differently had it been restricted to
considering only” one theory of liability. Id. at 220. The Texas Supreme Court
affirmed, holding that unless the appellate court is “reasonably certain that the jury
was not significantly influenced” by the legally unsupported issue, the error is
reversible. Id. at 227–28 (quoting Braun v. Flynt, 731 F.2d 1205, 1206 (5th Cir.
1984)). The court also observed that it must remand for a new trial on the negligence
issue because the jury’s finding on the unsupported theory of liability may also have
affected the jury’s damages findings. Id. at 230–31.
          Similarly, a new trial is necessary in this case, because the jury reasonably
could have apportioned liability differently as between Houston Gardens and the
remaining defendants if HHD had not been included in the negligence charge. The
jury apportioned 45% of the liability to HHD and 40% to Houston Gardens. The
finding of vicarious liability against HHD was not supported by legally sufficient
evidence, and we are not reasonably certain that HHD’s inclusion in the jury charge
did not affect the jury’s apportionment of liability or the finding of damages against
Houston Gardens, particularly given HHD’s contention on appeal that the reason it
is not the nursing home employer is because Houston Gardens fits that role. As we
discuss next, we conclude that legally sufficient evidence supports Carr’s claim for
negligence against Houston Gardens. Accordingly, we remand the case for a new
trial on the negligence claim against Houston Gardens.



III. HOUSTON GARDENS’S APPEAL
          In its appeal, Houston Gardens contends (1) the trial court erred in entering
judgment against it if this court finds HHD was the employer for the purposes of
vicarious liability, because then Houston Gardens cannot be liable, and the evidence
thus was legally and factually insufficient to support a finding against Houston
Gardens; (2) the trial court erred in entering judgment on the jury’s verdict awarding
exemplary damages; and (3) the trial court erred in failing to properly apply a
statutory cap with respect to the jury’s award of actual damages. 
          In connection with its vicarious liability argument, Houston Gardens claims
that under St. Joseph, only one of the two entities, HHD or Houston Gardens, can be
vicariously liable for the negligence of the nursing home staff. It does not contend
that insufficient evidence exists that it was the employer for the purposes of vicarious
liability—as it conceded as much at trial—but instead argues that if HHD is found to
be the employer, then no basis exists for the judgment against Houston Gardens on
a theory of vicarious liability. Importantly, Houston Gardens does not contest on
appeal that the evidence supports the jury’s finding that Mr. Carr received negligent
health care. In fact, several members of the nursing staff employed at Houston
Gardens during the time Mr. Carr resided there testified that he received negligent
care.


 Moreover, Houston Gardens did not contest at trial that it was the entity whose
employees provided the care to Mr. Carr.


 Because we hold the evidence is legally
insufficient to find that HHD was the vicariously liable employer, Houston Gardens’s
first issue is moot. 
          Houston Gardens further claims the evidence is legally insufficient to support
a finding of liability against it based on a theory of negligent hiring. We disagree. 
Legally sufficient evidence exists to find Houston Gardens vicariously liable for the
conduct of the nursing home staff and its hiring. Sam Gerber testified that Houston
Gardens was the entity licensed to operate the nursing home, meaning it had a duty
to uphold and comply with state standards. Houston Gardens relies on the fact that
it entered into a contract for Health Care Holdings to assist in managing the facility,
yet Houston Gardens did not introduce this contract at trial, so the jury could infer
from the evidence presented that Houston Gardens bore responsibility for hiring
decisions made at the nursing home. Houston Gardens’s administrator oversaw the
day-to-day operations of the nursing home, and was ultimately responsible for the
care provided by the staff. The director of nursing was responsible for ensuring
compliance with state and federal regulations, delegation of duties, ensuring proper
charting, and implementing patient care plans. The nurses’ aides, who provided at
least eighty percent of the hands-on care to patients, were controlled by the charge
nurses, who were controlled by the unit managers, who were controlled by the
director of nursing. With the exception of White, all of the nursing home witnesses
testified that they worked for Houston Gardens. White testified that Health Care
Holdings hired her, but conceded it did so pursuant to a contract with Houston
Gardens, a contract that was neither offered into evidence nor otherwise described as
to its contents. The evidence supports the implied finding by the jury that Houston
Gardens controlled the hiring and the details of the health care provided by the
nursing home staff. We therefore hold that legally sufficient evidence supports the
jury’s finding of liability against Houston Gardens. Because we reverse and remand
the case for a new trial to determine the apportionment of liability under Romero, we
do not reach Houston Gardens’s remaining issues on appeal that relate to factual
sufficiency, actual damages, and exemplary damages.
IV. CONCLUSION

          Applying St. Joseph Hospital, we hold the evidence is legally insufficient to
support the jury’s verdict against HHD based on a theory of vicarious liability, but
hold the evidence is legally sufficient to support the jury’s verdict as to Houston
Gardens under that theory. 94 S.W.3d at 543. We therefore reverse the judgment
against HHD and render judgment in its favor. The jury apportioned liability among
HHD and Houston Gardens, and awarded damages against each defendant. We
cannot be reasonably certain that the inclusion of HHD in the charge did not affect
the jury’s findings as to damages and the apportionment of liability with respect to
Houston Gardens. We therefore remand the case for a new trial as to Houston
Gardens. See Romero, 266 S.W.2d at 230–31.
 


                                                             Jane Bland
                                                             Justice
 
Panel consists of Chief Justice Radack and Justices Alcala and Bland.